Margaret L. WILLIAMS, Plaintiff,

v.

GRIMES AEROSPACE COMPANY, f/k/a Midland Ross, Grimes Division, and Kilgore Group, Inc., d/b/a Columbia Staffing, Defendants.

No. 8:96–3221–20AK.

United States District Court, D. South Carolina, Greenwood Division.

Dec. 19, 1997.

---

Nancy A. Lipski, Lexington, SC, for Plaintiff.

Steven M. Wynkoop, Elizabeth M. McMillan, Greenville, SC, Kevin W. Sturm, Spartanburg, SC, for Defendants.

## ORDER

HERLONG, District Judge.

This matter is before the court on the motion of the defendants, Grimes Aerospace Company ("Grimes") and Kilgore Group, Inc., d/b/a Columbia Staffing ("Columbia Staffing"), for summary judgment. The plaintiff, Margaret L. Williams ("Williams"), a former employee of each defendant, alleges that the defendants terminated her and failed to promote her in violation of state and federal law. Williams contends the defendants' conduct: (1) violated Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) breached her employment contract; (3) breached an implied covenant of good faith and fair dealing within that contract; (4) violated South Carolina's wage payment statute; (5) unjustly enriched the defendants; and (6) was outrageous to the point of causing her personal injury.

### I. PROCEDURAL BACKGROUND

Williams filed this action on October 22, 1996. The parties ran into several difficulties during the course of discovery. Williams' counsel initially failed to respond to discovery because Grimes had misspelled her name on its requests. (Pl.'s Mem. in Opp. to Def. Grimes' Mot. to Compel at 2–3.) Grimes filed a motion to compel discovery on March 21, 1997. Magistrate Judge William M. Catoe, Jr. denied this motion and the

issue was ultimately resolved without the court's assistance.

Discovery continued slowly for several weeks, and then came to a screeching halt. The original scheduling order instructed the parties to complete discovery by June 2, 1997, and be ready for trial by the September 1997 term of court. Due to the earlier discovery difficulties, the parties did not schedule Williams' deposition until July 17, 1997. (Pl.'s Not. of Mot. & Mot. for Protect. Order at 1–2.) Williams moved on July 16, 1997, for a protective order preventing her own deposition. In her motion, Williams represented that the parties could not agree to extend the discovery deadline and that it was now too late to take her deposition. (*Id.* at 2–3.) In fact, the parties had agreed to extend the discovery deadline, but Williams refused to consent because of a matter unrelated to discovery. (Def.'s Resp. to Mot. for Protect. Order at 1.) Magistrate Judge Catoe refused to grant the protective order. Williams disregarded the magistrate judge and did not appear for her deposition.

Counsel for the parties attended the August 26, 1997, roster meeting ("August roster meeting") of this court. At that time, counsel for both parties informed the court of their discovery difficulties. Understandably, counsel for the defendants stated that they would be unable to file any substantive motions before Williams gave her deposition. Upon hearing from all counsel involved, the court ordered Williams to make herself available for her deposition as soon as a date could be set. The parties agreed to depose Williams on September 30, 1997. The parties also scheduled the depositions of various representatives of the defendants at that same time. Due to the failure of the parties to resolve these discovery matters, the court first continued the case until the November 1997 term of court and ultimately set the case for trial during the January 1998 term.

Grimes filed its motion for summary judgment on October 16, 1997. Columbia Staffing so moved on October 20, 1997. Williams responded to both of these motions through a memorandum filed on October 31, 1997. Grimes and Columbia Staffing replied to Williams' response on November 7 and 10, 1997, respectively. This case is currently slated for the January 1998 term of court.

## II. FACTUAL BACKGROUND

Williams' employment saga with Grimes began nearly a decade ago. Grimes manufactures lighting systems for aircraft. Williams, a black female, initially worked at Grimes' place of business as a temporary employee through the Manpower Temporary Agency in 1988. On January 3, 1989, Grimes hired Williams for a full-time position in its assembly department. As a full-time Grimes employee, Williams received an employee handbook detailing the company's benefit plans. Williams worked faithfully for Grimes until 1992. In December of 1992, Grimes laid off numerous workers, including Williams, in an effort to combat declining business revenues. Grimes offered the fired workers an option of either an early severance package or placement on the active recall list, but not both. Advised of these options, Williams took the early severance payment and removed her name from the active recall list.

Without work, Williams sought employment with Columbia Staffing, a temporary employment agency. In June of 1993, Grimes solicited temporary help for newly acquired business through Columbia Staffing. Grimes told Columbia Staffing the names of several former workers, including Williams, that it wanted to employ through Columbia Staffing. Williams began working at the Grimes facility as an employee of Columbia Staffing on June 9, 1993. Though Williams reported to work at Columbia Staffing and completed all employment-related paperwork there, she apparently believed she was an employee of both Grimes and Columbia Staffing. (Pl.'s Mem. in Opp. to Defs.' Mots. for Summ. J. at 6.) Columbia Staffing did not give Williams any written policies or procedures for employment.

During her 1993 work assignment at Grimes, Williams registered her work hours on Grimes' time clock. However, Columbia Staffing received the time and payment information from Grimes and paid Williams accordingly. This continued until November 5, 1993, when Grimes informed Columbia Staffing it no longer needed Williams.

Williams filed for unemployment compensation, listing Columbia Staffing as her employer.

On July 25, 1994, Williams returned to work at the Grimes facility through a new employment arrangement with Columbia Staffing. During her 1994 assignment, Williams applied for a position as "group leader" with Grimes. Grimes posted a notice requesting applicants for the position, noting that full-time Grimes employees were preferred. Several temporary employees applied for the position. However, Grimes named Vanessa Goodwin, a black female who worked full-time for Grimes, as the new group leader. Williams' 1994 work assignment lasted until December 30, 1994. Again, Williams filed for unemployment benefits following her termination, listing Columbia Staffing as her employer.

Williams began a third temporary tour of duty at Grimes as an employee of Columbia Staffing on February 13, 1995. During her 1995 tour, Williams responded to several postings for full-time positions, but was selected for none. Of the four positions she sought in 1995, two were filled by full-time employees and two were never filled. Also, during her 1995 assignment, Williams made several complaints regarding the calculation of her pay. Williams claimed she was not given sufficient overtime pay during one week and that she did not receive several days of holiday pay. Initially, Williams voiced her concerns to Grimes. Grimes informed Williams that it did not pay her wages and she would need to notify Columbia Staffing of any problem. Upon investigating Williams' complaint, Columbia Staffing promptly paid Williams the amount she claimed was due.

It was also during this third temporary assignment at Grimes that Williams first charged Grimes with racial discrimination in a complaint with the Equal Employment Opportunity Commission ("EEOC") on April 27, 1996. Williams accused Grimes of discrimination by denying her a full-time position due to her race. In July of 1996, Williams requested and received a right to sue notice from the EEOC. On August 19, 1996, Grimes offered Williams a full-time position with the company. Williams accepted the offer.

### III. TIMELINESS OF THE MOTIONS FOR SUMMARY JUDGMENT

■ The defendants' motions for summary judgment are suitable for discussion and disposition at this time. Williams initially objects to the motions as untimely. (Pl.'s Mem. in Opp. to Mots. for Summ J. at 3.) As outlined above, the original scheduling order in this case directed all discovery to be completed by June 2, 1997, and all motions to be filed by July 16, 1997. Though this and other matters were thoroughly discussed at the August roster meeting, Williams still objects to the motions. At the August 1997 meeting, the court was shocked to learn that the plaintiff had not given her deposition in a case that was scheduled for trial in September of 1997. All counsel detailed the discovery problems to the court, and the counsel for the defendants specifically said that these discovery matters were preventing them from filing their respective motions for summary judgment. After hearing these concerns, the court ordered Williams to appear for her deposition and continued the case. In doing so, the court clearly extended the time for discovery, and, therefore, the time for filing dispositive motions.

Furthermore, this same argument arose again at the roster meeting held on October 21, 1997 ("October roster meeting"). After filing motions for summary judgment on October 16 and 20, 1997, counsel for the defendants at the October roster meeting requested the court continue the case for one further term so that summary judgment motions would receive proper consideration. The court agreed and continued the case for a second time specifically to review the defendants' motions. Williams' counsel made no objection at that time to the continuance. She may not do so now. It is difficult for the court to believe that counsel for Williams expected her adversaries to file motions for summary judgment before her client was even deposed. The court agrees that all counsel neglected to properly resolve the initial discovery problems and reschedule discovery accordingly. *See* Local Rule 12.11 (D.S.C.1997) (requirements for extending dis-

covery). However, Williams has no right to object to the motions presently before the court. The defendants had a right to depose the plaintiff prior to filing their motions. Furthermore, Williams waived any right she did have by failing to properly address the matter at the August or October roster meetings. The court now proceeds with the merits of the motions.

### IV. SUMMARY JUDGMENT STANDARD

In considering a motion for summary judgment, the facts and inferences must be viewed in the light most favorable to the opposing party, and summary judgment is proper only when there is no genuine issue of material fact. *Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1004 (4th Cir.1987) (citations omitted). Although the burden of proof initially rests with the moving party, when the movant has supported the motion as provided in Rule 56, the opposing party must provide "specific facts showing that there is a genuine issue for trial." *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364–65 (4th Cir.1985), *overruled on other grounds*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Additionally, the nonmoving party cannot rest on the bald assertions of his pleadings; wholly speculative assertions will not suffice. *Id.* at 364 (citations omitted).

### V. DISCUSSION OF THE LAW

#### A. Joint Liability for Grimes and Columbia Staffing

##### 1. General agency theory

Williams cannot hold Grimes and Columbia Staffing liable for each other's actions under a theory of agency. "Agency is a fiduciary relationship which results from the manifestation of consent by one person to another to be subject to the control of the other and to act on his behalf." *Peoples Fed. Sav. & Loan v. Myrtle Beach Golf & Yacht Club*, 310 S.C. 132, 425 S.E.2d 764, 773 (1992), *cert. dismissed*, 314 S.C. 53, 443 S.E.2d 807 (1994). "The test to determine agency is whether or not the purported principal has the *right to control* the conduct of his alleged agent." *Fernander v. Thigpen*, 278 S.C. 140, 293 S.E.2d 424, 426 (1982) (emphasis in original). Williams bases much of her case on an agency theory. She claims that at all pertinent times, Grimes and Columbia Staffing were one another's agent and, therefore, were liable for one another's actions in regard to her employment. (Pl.'s Mem. in Opp. to Defs.' Mots. for Summ. J. at 8.) Her argument fails to recognize South Carolina's law on agency.

Grimes and Columbia Staffing did enter into a contractual relationship together to provide Grimes with labor. Grimes paid Columbia Staffing for its services and Columbia Staffing paid the workers' wages. Grimes also told Columbia Staffing of certain employees it preferred to employ because of their previous employment in its plant. At all times, each company was acting on its own behalf and was not under the control of the other. "The mere fact that one of the contracting parties is empowered to give general directions as to what is to be done without control over the methods or means of doing it does not necessarily have the effect of creating the relation of principal and agent or master and servant." *Chatman v. Johnny J. Jones Exposition*, 212 S.C. 215, 47 S.E.2d 302, 304–05 (1948). Therefore, neither Grimes nor Columbia Staffing exhibited the requisite control over the other to be considered one another's agent. Though Grimes and Columbia Staffing, as discussed below, may each be individually liable as Williams' employer, they are not liable for one another's acts under agency principles.

##### 2. Title VII claim

Though Williams' agency argument fails, she may be able to hold both Grimes and Columbia Staffing liable for discrimination under Title VII. Once an anomaly, today many temporary workers report to one workplace and receive their paychecks from another. While the phenomenon of temporary employees first gained momentum in the United States' post-World War II economy, "the temporary help industry has [recently] exploded, especially since the 1980s." *Development in the Law—Employment Discrimination: V. Temporary Employment and the Imbalance of Power*, 109 Harv. L.Rev. 1647, 1648 (1996) (hereinafter, *Temporary Employment*); *see also* H. Lane Dennard, Jr. &

Herbert R. Northrup, *Leased Employment: Character, Numbers and Labor Law Problems,* 28 Ga. L.Rev. 683, 696 (1994) (charting growth of employee leasing from 1984–1993). During this same period, Congress increasingly placed most areas of the employment relationship under the jurisdiction of the federal courts .[1] As these two shifts in the paradigm of employment law collided, federal courts have found themselves ill-prepared to address the problems presented by the temporary employment relationship. Which party is the liable employer is seldom clear. · In order to properly analyze the case at bar, the court surveys Title VII for: (1) "employment agency" liability; (2) "employer" liability; and, finally, (3) liability for agents of employers. Whether an employer or an agent, the law reveals that liability hinges on who is in control.

### a. Employment agency liability

■ Temporary employment agencies, like Columbia Staffing, may be liable for discrimination under a number of theories: as agencies, as employers, and as agents of employers. First, Title VII specifically addresses the ."employment agency." The law reads: "It shall.be unlawful . . . for an employment agency to fail to refer for employment . . . or refer for employment any individual on the basis of his race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(b). This is distinguished from the general Title VII section on employment discrimination which prohibits employers from discriminating in hiring, firing, and employment terms. 42

U.S.C. § 2000e–2(a). Williams does not allege that Columbia Staffing discriminated against her in its referral process. Rather, she contends that it is liable under the general discrimination section as her employer. Temporary agencies may be liable for employer discrimination if they are, in fact, a general employer. Therefore, the court must determine who was Williams' employer under Title VII.

### b. Employer liability

■ Employers may be liable for racial discrimination against employees in the workplace. 42 U.S.C.A. § 2000e–2(a). Furthermore, in the proper context, courts have held two employers jointly liable for a Title VII violation. *See, e.g., Graves v. Lowery,* 117 F.3d 723, 727 (3d Cir.1997); *Caldwell v. ServiceMaster Corp.,* 966 F.Supp. 33, 46 (D.D.C.1997); *Magnuson v. Peak Tech. Servs., Inc.,* 808 F.Supp. 500, 507 (E.D.Va. 1992), *aff'd,* 40 F.3d 1244 (4th Cir.1994); *Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc. .,* 611 F.Supp. 344, 349 (S.D.N.Y.1984), *aff'd sub nom, Aharnare v. Merrill Lynch,* 770 F.2d 157 (2d Cir.1985).[2] A defendant may be held liable under Title VII if it (1) fits within the "employer" definition of Title VII and (2) "exercises substantial control over significant aspects of the compensation, terms, conditions, or privileges of plaintiff's employment." *Magnuson,* 808 F.Supp. at 507 (citing *Amarnare* ). In determining "employer" status, the court is guided by the "broad, remedial purpose of Title VII

1. Most aspects of an individual's employment relationship are governed by federal law. *See, e.g.,* 29 U.S.C.A. §§ 151–169 (National Labor Relations Act); 29 U.S.C.A. §§ 201–219 (Fair Labor Standards Act); 29 U.S.C.A. §§ 621–634 (Age Discrimination in Employment Act); 42 U.S.C.A. §§ 301–306 (Social Security Act); 42 U.S.C.A. §§ 2000e (Civil Rights Act); 42 U.S.C.A. §§ 12101–12213 (Americans with Disabilities Act). Most of these statutes contain "circular definitions" of the employment relationship: i.e., an employee is anyone employed by an employer. *Temporary Employment, supra,* at 1652 n. 35. Therefore, courts have developed various tests to determine who is an employer and who is an employee under federal law.

2. In such a scenario, courts consider the two entities to be "joint employers." *See Graves,* 117 F.3d at 727. However, as noted by one court,

this term is not meant to indicate that the two employers are one "integrated enterprise." *Amarnare,* 611 F.Supp. at 347 n. 11. The term, as used herein, is meant to show that both employers jointly exercised the requisite amount of control for Title VII liability to hold.

· The same "joint employer" theory is used by the courts in labor litigation to bind more than one company to a negotiated contract. *See America's Best Quality Coatings Corp. (ABQC) v. N.L.R.B.,* 44 F.3d 516, 523–24 (7th Cir.), *cert. denied,* 515 U.S. 1158, 115 S.Ct. 2609, 132 .L.Ed.2d 853 (1995); *Capitol E.M.I. Music,* 311 N.L.R.B. 997, 1000 (1993), *enforced sub nom, Capitol EMI Music v. NLRB,* 23 F.3d 399 (4th Cir.1994). One court has also held that joint employers may be liable for discrimination under federal bankruptcy law. *Fiorani v. CACI,* 192 B.R. 401, 408–09 (E.D.Va.1996).

which militates against the adoption of a rigid rule strictly limiting 'employer' status ... to an individual's direct or single employer." *Id.* at 508 (footnote omitted). Grimes and Columbia Staffing clearly fit within Title VII's definition for an "employer." *See* 42 U.S.C.A. § 2000e(b) ("employer" is person engaged in industry affecting commerce with at least fifteen employees). Thus, to be Williams' employer, each company must have exhibited the requisite control.

■ Courts utilize three primary tests to determine who has control over an alleged employee under federal law.[3] The United States Court of Appeals for the Fourth Circuit follows the hybrid, or *Spirides,* test for Title VII cases. *See Garrett v. Phillips Mills, Inc.,* 721 F.2d 979, 981–82 (4th Cir. 1983). The *Spirides* test, while emphasizing the control exhibited by the putative employer, considers eleven additional factors to determine if an individual is an employee: (1) the type of occupation; (2) the skill required for the occupation; (3) who furnished the equipment used at the place of work; (4) the length of time worked; (5) the method of payment; (6) how the relationship is terminated; (7) whether annual leave is available; (8) whether work is integral part of employer's business; (9) whether the employer provides retirement benefits; (10) whether the employer pays social security taxes; and (11) the intention of the parties. *Id.* at 982. Though the Fourth Circuit has never examined a temporary employment relationship under Title VII,[4] other federal courts have applied the *Spirides* test to an individual employed through a temporary employment agency.

In *Amarnare,* a black female employed through an employment agency sued the business where she worked for racial dis-crimination under Title VII. *Amarnare,* 611 F.Supp. at 346–47. Using the *Spirides* guidelines, the court focused in on the employer's right to control the plaintiff. The *Amarnare* court held that "[w]hen an employer has the right to control the means and manner of an individual's performance ... an employer-employee relationship is likely to exist." *Id.* at 348 (citing *Spirides,* 613 F.2d at 831–32). As evidence of this control, the court noted that the defendant "exercised complete control over [the plaintiff's] work assignments, the means and manner of her performance, and the hours of her employment," and retained a right to discharge the plaintiff. *Id.* In light of this degree of control, "[f]actors other than control are then of marginal importance." *Id.* Thus, the determination that an individual is an employee under Title VII hinges on control.

#### (1) Grimes as an "employer"

■ Grimes exhibited sufficient control to be considered Williams' employer under Title VII. Grimes maintained significant control over Williams during her various periods as a temporary employee. While "no one factor is determinative in ascertaining whether a defendant is an [employer] under Title VII," courts look to "all of the circumstances surrounding the work relationship ... with the greatest emphasis placed on the extent of the employer's right to control the manner and the means of the worker's performance." *Id.* at 510. In a Title VII context, the Fourth Circuit Court of Appeals recognizes three powers as most indicative of the control necessary to establish employer liability: hiring, firing, and conditions of employment. *Paroline v. Unisys Corp.,* 879 F.2d 100, 104 (4th Cir.1989), *aff'd in part,* 900 F.2d 27 (4th Cir.1990). Though Grimes did

3. The traditional rule under the common law was the "control" test, which applied basic agency principles. *Kelley v. Southern Pac. Co.,* 419 U.S. 318, 323–24, 95 S.Ct. 472, 475–76, 42 L.Ed.2d 498 (1974). In an effort to prevent harsh rulings against employees, federal courts developed the "economic realities" test for some situations. *See NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 124, 64 S.Ct. 851, 857, 88 L.Ed. 1170 (1944) (applying test under the NLRA); *United States v. Silk,* 331 U.S. 704, 713–14, 67 S.Ct. 1463, 1468–69, 91 L.Ed. 1757 (1947) (applying test under SSA). The third test, dis-cussed above, is the *Spirides,* or hybrid, test. *See Spirides v. Reinhardt,* 613 F.2d 826, 832 (D.C.Cir. 1979).

4. Though the Fourth Circuit has affirmed a district court case involving this issue, the unpublished decision did not discuss employment status under Title VII. *See Magnuson v. Peak Technical Services, Inc.,* 40 F.2d 1244, No. 93–1032, 1994 WL 619727 (4th Cir. Nov.3, 1994) (unpublished).

not pay wages or provide benefits to Williams, it did retain several important controls: the power to set her wage amount; the authority to assign and control her work detail; and, most importantly, the right to terminate her employment. *See Amarnare,* 611 F.Supp. at 348. Under this analysis, a reasonable jury could find that Grimes was Williams' employer during the periods she temporarily worked at its facility between 1993 and 1996.

### (2) Columbia Staffing as an "employer"

█ Columbia Staffing also exhibited the requisite control over Williams to be considered her employer under Title VII. Viewing this relationship under the *Spirides* test, Columbia Staffing exhibited sufficient control over Williams to be considered her Title VII employer. Columbia Staffing paid Williams' wages, benefits, and taxes. It also handled any complaints she had regarding her employment status. However, Columbia Staffing did not provide any equipment to Williams or assign her to a particular job. Despite this, the company did retain the right to hire and fire Williams, the ultimate means of control. Therefore, under the *Spirides* test with an emphasis on Columbia Staffing's right to control Williams, a genuine issue of fact exists regarding the status of Columbia Staffing as Williams' employer. *Id.* at 348.

### c. Agents of employers

█ Though both may be employers under Title VII, Grimes and Columbia Staffing are not one another's agent under Title VII. Title VII holds agents of employers liable as employers themselves for discrimination in the workplace. 42 U.S.C.A. § 2000e–3(b). This imposition of liability on an employer's agent is "an unremarkable expression of *respondeat superior*—that discriminatory personnel actions taken by an employer's agent may create liability for the employer." *Green v. Clarendon County School Dist. Three,* 923 F.Supp. 829, 848

(D.S.C.1996) (quoting *Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507, 510 (4th Cir.), cert. denied, 513 U.S. 1058, 115 S.Ct. 666, 130 L.Ed.2d 600 (1994)). Under this reasoning, the imposition of liability on employers' agents is intended to impute liability to an employer when one of its employees unlawfully discriminates. *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2407, 91 L.Ed.2d 49 (1986) ("Congress' decision to define 'employer' to include any 'agent' of an employer surely evinces an intent to place some limits on *the acts of employees* for which employers are liable under Title VII" (citations omitted) (emphasis added)). This framework does not fit the present situation.

Columbia Staffing was not an employee of Grimes, or vice versa. Each company was related through several contracts. In these contracts, Columbia Staffing sought to provide Grimes with adequate labor for a price. Neither company exhibited the type of control over the other to invoke liability on a *respondeat superior* basis. Title VII uses this common-law theory only to prevent employers from hiding behind the discriminatory acts of employees that they can control. Such a relationship did not exist between Grimes and Columbia Staffing. Therefore, while each defendant may be liable in their own capacity as employers, Columbia Staffing may not be liable under Title VII as an agent of Grimes.[5]

### 3. Statutory/common law claims

#### a. Columbia Staffing

█ Grimes and Columbia Staffing are joint employers for purposes of the state law claims as well. Under the common law, "[a] dual employment relationship may exist if more than one individual or company has the right to control or direct an employee in the performance of the work." 27 Am.Jur.2d *Employment Relationship* § 5 (1996). Such a relationship "may exist if two employers exercise substantial control over the employ-

5. Williams repeatedly cites *Magnuson* for the proposition that Grimes and Columbia Staffing may be liable as agents. (Pl.'s Mem. in Opp. to Defs.' Mots. for Summ. J. at 8, 15.) Her reasoning is not correct. *Magnuson* dealt almost exclu-

sively with joint employer liability under Title VII. *Pacelli,* 508 F.Supp. at 507–511. Though it did mention agency liability, the court determined that an agency theory did not fit a scenario with multiple employers. *Id.* at 510.

ee, by having the power to discharge the employee, and by controlling the employee in the performance of his or her duties." *Id.* Under South Carolina law, it is clear that workers for a temporary service agency are considered its employees. *Kilgore Group, Inc. v. South Carolina Employment Sec. Comm'n,* 313 S.C. 65, 437 S.E.2d 48, 49–50 (1993). Therefore, the court must analyze whether Grimes is Williams' employer for her statutory and common-law claims.

#### b. Grimes

Grimes exercised sufficient control to be considered an employer. When determining the existence of an employment relationship, South Carolina uses an analysis similar to the Title VII test. South Carolina courts first ask "whether the purported employer has the right to control the servant in the performance of his work and the manner in which it is done." *Id.* at 49. The primary factors that answer this inquiry are: (1) direct evidence of the right to control; (2) payment method; (3) provision of the equipment; and (4) the right to fire. *Id.* at 49–50. As discussed above, Grimes controlled the amount of wages Williams earned, determined where and when she would work, and retained the right to fire. Therefore, viewing the facts in the light most favorable to Williams, Grimes could be viewed by a jury as Williams' joint employer with Columbia Staffing under South Carolina law.

### B. Title VII of the Civil Rights Act

Williams cannot maintain her claim against Grimes or Columbia Staffing for racial discrimination. In a Title VII claim, a plaintiff without direct evidence of intentional racial discrimination may prove her case indirectly under the burden-shifting proof scheme developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this scheme, the plaintiff must first present a *prima facie* case for racial discrimination. This gives rise to an inference of discrimination. *Mallory v. Booth Refrigeration Supply Co.,* 882 F.2d 908, 910 (4th Cir.1989). The employer may rebut this inference by articulating a legitimate nondiscriminatory reason for its deci-

sion. *Id.* Once the defendant has met this burden of production, to withstand summary judgment, a plaintiff must (1) raise a genuine factual issue about the legitimacy of the defendant's proffered reason and (2) provide sufficient evidence to raise a genuine factual issue on whether the decision was based on race. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 2751, 125 L.Ed.2d 407 (1993); *Moore v. J.P. Stevens & Co.,* 957 F.Supp. 82, 85 (D.S.C.1997).

#### 1. Williams' *prima facie* case

A plaintiff can make a *prima facie* case for racial discrimination under Title VII by proving the following: (1) she is a racial minority; (2) she applied and was qualified for a job for which the employer solicited applications; (3) she was rejected for the job despite her qualifications; and (4) after the rejection, the employer continued to seek applications from others with the same qualifications or filled the position with a non-minority employee. *Patterson v. McLean Credit Union,* 491 U.S. 164, 186–87, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989); *Mallory,* 882 F.2d at 910. In making her *prima facie* case, Williams is not required to show "that she is better qualified than the successful applicant." *Mallory,* 882 F.2d at 910.

#### a. Columbia Staffing

Even if she could prove her *prima facie* case, Williams cannot make a successful Title VII claim against Columbia Staffing. An employer is liable for racial discrimination only if it knew or should have known of the discriminatory conduct. *Dennis v. County of Fairfax,* 55 F.3d 151, 155 (4th Cir.1995). Under this rule, when an employee claims discrimination against two joint employers, she "must show that [each] defendant knew or should have known of the discriminatory conduct and that it failed to take those corrective measures within its control." *Caldwell,* 966 F.Supp. at 46 (citing *Magnuson,* 808 F.Supp. at 513). The bulk of Williams' complaint involves allegations against Grimes and its repeated failure to place her in a full-time position. Williams bases virtually her entire Title VII claim on the conduct of Grimes. (Compl. at paras. 6–

23.)[6] There is no evidence that Williams ever told Columbia Staffing of her failed attempts at full-time employment with Grimes.[7] Furthermore, Columbia Staffing had no reason to know of any alleged discrimination. As argued by Williams, "Columbia Staffing was nothing but a payroll service that cut Plaintiff's paycheck." (Pl.'s Mem. in Opp. to Defs.' Mots. for Summ. J. at 3.) Therefore, Williams cannot expect Columbia Staffing to be liable for Grimes' alleged conduct.

 No case in the Fourth Circuit has addressed this precise issue in a Title VII context. "Most Title VII cases involve the conventional single employer situation." *Magnuson*, 808 F.Supp. at 507. In the single employer arena, the Fourth Circuit has long required that employees give employers notice before liability attaches for unlawful discriminatory conduct.[8] The same logic applies in a joint employer context. It is only fair to require the plaintiff show that each defendant she contends committed unlawful discrimination knew of the discriminatory conduct or, at a minimum, should have known of it. Addressed above, today's workforce is composed of increasingly large numbers of part-time employees provided by temporary employment agencies. Discrimination of some form among some of these temporary employment relationships will inevitably occur. Workplace discrimination will most likely come from the employer where a person works, not the temporary agency. As in the instant case, the temporary agency often will have little to no daily contact with the employee.[9] In such a setting, a temporary employment agency would have no indication of any workplace discrimination without notice from the employee. It would be grossly inequitable to hold such an agency liable for discrimination that it was not aware of, had no reason to know was taking place, and of which it had no control.

Furthermore, the Fourth Circuit's notice requirement furthers the purpose of Title VII. Congress enacted Title VII and subsequent laws to end discrimination in the workplace by encouraging employers and employees to address the problem first-hand. *See McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 358, 115 S.Ct. 879, 884, 130 L.Ed.2d 852 (1995); *Dennis*, 55 F.3d at 154. In order to facilitate resolutions from within the workplace, employees should first air any grievances with their employer. Only if this fails should an employee take his case to the courts. Requiring employees to notify employers of any alleged discrimination encourages in-house resolution of employment problems. At a minimum, legal action should not be allowed unless the employee can show the employer should have known of the discriminatory practices. Williams did not notify Columbia Staffing of any alleged discrimination, nor has she shown that Columbia Staffing should have been aware of any such problems. Therefore, Columbia Staffing is not liable for the alleged discriminatory conduct of Grimes.

 Williams' only allegation of direct discrimination by Columbia Staffing is insufficient to survive summary judgment. In her complaint, Williams asserts that Columbia Staffing sent several employees to Grimes, but arbitrarily paid black workers less than whites. (Compl. at para. 21.) These allega-

---

**6.** One paragraph in this sequence, paragraph twenty-one of the Complaint, does involve allegations against Columbia Staffing. However, as discussed herein, this allegation does not amount to racial discrimination under Title VII.

**7.** In fact, Williams goes to great pains in her complaint to allege that she had no contact with Columbia Staffing for much of the period of time in question. *See* (Compl. at paras. 11, 13, 15, 18) ("[during the periods at issue] Plaintiff did not have any contact with any member or employee of Columbia Staffing").

**8.** *See, e.g., Andrade v. Mayfair Management, Inc.*, 88 F.3d 258, 261 (4th Cir.1996) (sexual discrimi-

nation); *Dennis*, 55 F.3d at 155 (racial discrimination); *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1131 (national origin discrimination).

**9.** Recognizing this development, one court goes further than this ruling to hold that temporary employment agencies are not the employer of assigned workers for Title VII purposes. *Kellam v. Snelling Personnel Servs.*, 866 F.Supp. 812, 816 (D.Del.1994), *aff'd,* 65 F.3d 162 (3d Cir.1995). Therefore, under this reasoning, once the employee is assigned to a workplace, the temporary service cannot be held liable for Title VII discrimination. *Id.*

tions do not concern Williams directly. Even if these assertions could be substantiated, they are not probative of her Title VII claim. Conclusory allegations of "discrimination against others [are] not determinative of an employer's reason for the action taken against the individual grievant." *Taylor v. Cummins Atlantic, Inc.*, 852 F.Supp. 1279, 1284 n. 4 (D.S.C.1994)(quoting *Terrell v. Feldstein Co., Inc.*, 468 F.2d 910, 911 (5th Cir.1972)), *aff'd*, 48 F.3d 1217 (4th Cir.), *cert. denied*, 516 U.S. 864, 116 S.Ct. 176, 133 L.Ed.2d 116 (1995). Therefore, Williams' lone claim of direct discrimination by Columbia Staffing fails as a matter of law.

### b. Grimes

Williams can make out a limited *prima facie* case for racial discrimination against Grimes. Grimes concedes that Williams is a racial minority who applied for several positions that she did not receive. (Def. Grimes' Mem. in Supp. of Mot. for Summ. J. at 9.) Therefore, the remaining question is: Did Grimes continue to seek applications from other qualified individuals or fill any position in question with a white applicant?

 Williams applied for five positions at Grimes between 1994 and 1995.[10] For each position, Grimes considered part-time applicants "only if the position was not filled by a current full-time employee." (*Id.* at 10.) Thus, qualified applicants consisted initially of only full-time employees. If no full-time applicants were available, temporary workers could then apply. Grimes filled the position of group leader with a full-time applicant and did not fill two other positions. Therefore, even if Williams could show that Grimes viewed her application first, Grimes did not continue to seek applications from others with her qualifications for these positions. *Patterson*, 491 U.S. at 186–87, 109 S.Ct. at

2377–78. Therefore, she does not meet her *prima facie* case for these three positions.

 Williams does make her *prima facie* case for the other two positions. Williams applied for the jobs as a temporary order processor and screen printer in 1995. Grimes filled these positions with non-minority applicants. Therefore, Williams makes out a *prima facie* case for racial discrimination in regards to these positions. *See id.*

### 2. Grimes' non-discriminatory reason

 Grimes establishes a valid, non-discriminatory reason for not hiring Williams for these two positions. Articulated above, Grimes initially sought only full-time employees to fill vacant positions. The 1995 applications made by Williams, for temporary order processor and screen printer, were filled by full-time employees. Though the two chosen were white, this is a valid, non-discriminatory reason for Grimes' decision.

### 3. Pretext for discrimination

 Following Grimes' articulation of a non-discriminatory reason for its decision, Williams bears the ultimate burden of proving intentional discrimination. *Amirmokri*, 60 F.3d at 1130. To withstand summary judgment, Williams must both (1) raise a genuine issue of fact about the legitimacy of Grimes' proffered reason and (2) provide sufficient evidence to raise a genuine question as to whether the employment decision was based on her race. *See Hicks*, 509 U.S. at 515, 519, 113 S.Ct. at 2751, 2753; *see also Beall v. Abbott Labs.*, 130 F.3d 614, 618 (4th Cir.1997) (published opinion) (quoting *Hicks*, 509 U.S. at 515, 113 S.Ct. at 2751) (Title VII plaintiff must show " 'both that the reason was false and that discrimination was the real reason' for the challenged conduct");

---

10. These positions were: group leader, temporary order processor, screen printer, paperwork/packer, and pad printer operator.

Williams' memorandum additionally argues that she "believed" she applied a second time for pad printer operator in 1994. (Pl.'s Mem. in Opp. to the Mots. for Summ. J. at 12.) She maintains that this position was filled by a white applicant, Johnny Moss. (*Id.* at 13.) However, in her deposition, cited as evidence of this applica-

tion, Williams clearly states she did not apply for the position that Grimes awarded to Moss. (Williams Dep. at 190.) Williams' Title VII action fails because she cannot cite properly documented evidence to support her claim. *See Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987). Therefore, the court will not consider this application in Williams' Title VII claim against Grimes.

*Moore,* 957 F.Supp. at 85. Williams is not able to shoulder this burden.

■ Grimes' promotion policy was not a pretext for discrimination. Grimes employed many permanent and part-time employees. When soliciting applications from temporary employees for permanent positions, Grimes' notice stated: "If the . . . job is not filled and you are a part-time or temporary employee who is interested in the position, please sign below." (Def. Grimes' Mem. in Supp. of Mot. for Summ. J. at 10.) This clearly told temporary employees that their applications would be considered only if the position was not first filled by a permanent applicant. This policy looked first to the immediate work experience of the applicants, not their race. As noted above, Grimes used this policy to fill one position Williams applied for with a full-time black employee, Vanessa Goodwin. (Pl.'s Mem. in Opp. to Defs.' Mots. for Summ. J. at 13.) Though Williams' ability as both a full-time and temporary employee of Grimes is unquestioned, the fact remains that she was not a permanent employee when she applied for the jobs in question. Accordingly, Williams cannot raise a genuine question of fact as to the veracity of Grimes' nondiscriminatory reason. Additionally, Grimes cannot provide any evidence showing that Grimes' decision was based on her race.

### C. Breach of Contract

■ The law of South Carolina and the facts of this case direct this court to grant summary judgment to the defendants on Williams' breach of contract claim.. Employment agreements that have no definite term of duration are generally terminable at the will of either party. *Prescott v. Farmers Telephone Cooperative, Inc.,* 328 S.C. 379, 491 S.E.2d 698, 701 (Ct.App.1997) (citation omitted). "However, an employer may modify its workers' at-will status through written

handbooks and oral assurances." *Id.* (citations omitted). Williams bases her breach of contract claim on Grimes' employee handbook she received as a permanent employee in 1989.[11] (Pl.'s Mem. in Opp. to Defs.' Mots. for Summ. J. at 15.) . Though the conduct Williams complains of occurred between 1993 and 1996, when she was a temporary employee of Grimes, she argues that (1) she retained full employment status and (2) Grimes' handbook was in effect at all times. (*Id.* at 15–16.)

Williams' cannot support these claims. Under the above analysis, Williams can be considered an employee of Grimes during the periods in question. *See Kilgore Group, Inc.,* 437 S.E.2d at 49–50. However, she may not graft the terms of Grimes' employee handbook onto her post–1993 relationship with the company. Williams was hired by Grimes as a full-time employee in 1989. Grimes issued her an employee handbook that defined the rights and responsibilities of full-time employment. Grimes fired Williams from this position in 1992, forever changing her relationship with the company. This ended any effect the employee handbook had, unless Grimes chose to grant her an employment status that would warrant application of its employee handbook.[12]

In 1994, Williams went back to work at the Grimes facility through her employment with Columbia Staffing. Though Grimes could still be considered her employer under common-law principles, this does not mean that the new relationship returned Williams to the status of a full-time employee. Furthermore, the employee handbook could govern this new employment relationship only upon Grimes' election. Grimes did not so elect. Instead, Grimes chose to employ Williams through a temporary agency, Columbia Staffing. Under this new scenario, it would be a manifest injustice for the court to force the

11. Because Williams' contract claim is based solely on the Grimes handbook, Columbia Staffing cannot be liable under this cause of action. As noted above, Columbia Staffing was not Grimes' agent during Williams' employment with the companies.

12. The most clear evidence of this altered relationship comes from Williams' own testimony.

In her deposition she stated that from June of 1993 until August of 1996, she continued to apply for various jobs because she "was laid off." (Williams Dep. at 68.) Williams' testimony of the sporadic nature of her employment at Grimes from 1993 until 1996 evidences the distinct difference between her full-time and part-time employment with Grimes.

terms of the employee handbook upon Grimes by implication. Therefore, Grimes re-employed Williams as an at-will temporary employee with no other terms altering this status. As such, there was no contract for Grimes to breach.

### D. Breach of the Covenant of Good Faith and Fair Dealing

■■■■ Williams' claim for breach of the covenant of good faith and fair dealing also fails. Courts imply this covenant into all contracts, including those made for employment. *Shelton v. Oscar Mayer Foods Corp.,* 319 S.C. 81, 459 S.E.2d 851 (1995), *aff'd,* 325 S.C. 248, 481 S.E.2d 706 (1997); *see also Prescott,* 491 S.E.2d at 706. However, this implied covenant can attach only to an existing contract. *See Shelton,* 459 S.E.2d at 857. Therefore, this covenant does not apply. unless a contract first exists. As detailed above, Williams' post–1993 employment with Grimes was at-will and without any contractual terms. Furthermore, Williams never had a contract with Columbia Staffing. Therefore, her claim for breach of the covenant of good faith and fair dealing fails.

### E. South Carolina's Wage Payment Act

■■■■ Williams cannot maintain a cause of action for back wages. South Carolina's Payment of Wages Act seeks to "protect employees from the unjustified retention of wages by the employer." *Futch v. McAllister Towing of Georgetown, Inc.,* 328 S.C. 312, 491 S.E.2d 577, 579 (Ct.App.1997). The Act requires employers to notify employees of "normal hours and wages agreed upon" and to "pay all wages due the employee within forty-eight hours [of the employee's termination]." S.C.Code Ann. § 40–10–30 & –50 (Supp.1996). Williams alleges that she was a full-time employee from the point of her re-hire in 1993 until August of 1996. However, she has presented no evidence to support this claim.

■■■■ During this period, Columbia Staffing was responsible for paying Williams' wages.[13] It notified Williams of all work-related information, including her status as a temporary employee and the amount of her wages. (Def. Kilgore Group's Reply to Pl.'s Mem. in Opp. to Defs.' Mots. for Summ. J. at 13.) Though Williams. did not receive some overtime pay when it was due, Columbia Staffing paid her all of the disputed wages following an investigation. (Def. Kilgore Group's Mem. in Supp. of Mot. for Summ. J. at 11.) A short delay in the payment of wages does not violate the Payment of Wages Act. Columbia Staffing properly notified Williams of her work status and properly paid her all wages due for her work at Grimes. Therefore, Williams' claim under the Wages Act fails.

### F. *Quantum Meruit*

■■■■ Williams does not state a proper claim for *quantum meruit* under South Carolina law. To satisfy this charge, Williams must show: (1) a benefit conferred to the defendant by the plaintiff; (2) realization of that benefit by the defendant; and (3) that retention of the benefit would be unjust unless the defendant makes full payment to the plaintiff. *Columbia Wholesale Co. v. Scudder May N.V.,* 312 S.C. 259, 440 S.E.2d 129, 130 (1994). Grimes and Columbia Staffing did benefit from Williams' work, but Williams presents no evidence that this was an unjust enrichment. Grimes hired. Williams in 1993 as a temporary employee. Williams accepted this hire, through Columbia Staffing, and its rate of pay with no objection. (Williams Dep. at 74–75.) From the evidence presented, there was no misunderstanding regarding Williams' pay, benefits, or work status. Grimes hired her as a temporary worker at a set hourly wage without benefits. She was paid accordingly by Columbia Staffing. Neither Grimes nor Columbia Staffing was enriched unjustly. Therefore, Williams may not maintain a cause of action for *quantum meruit.*

### G. Outrage

■■■■ William's claim for the tort of outrage fails as a matter of law. To state a claim for outrage, a plaintiff must establish:

---

**13.** Grimes is not liable under this cause of action. Columbia Staffing handled all payment of wages to Williams. Discussed above, Williams cannot hold Grimes liable for this claim as the agent of Columbia Staffing.

(1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by plaintiff was so severe that no reasonable man could be expected to endure it.

*Shupe v. Settle,* 315 S.C. 510, 445 S.E.2d 651, 655 (Ct.App.1994) (citation omitted). It is a matter for the court, not a jury, to determine in the first instance whether the conduct in question can reasonably be regarded as so extreme and outrageous as to permit recovery. *Id.* 655–56. The defendants' conduct simply does not meet South Carolina's standard. Any alleged conduct in the instant case was not "so extreme and outrageous as to exceed all possible bounds of decency." *Id.* Accordingly, the court grants the defendants' motions for summary judgment as to the outrage claim.

## VI. CONCLUSION

Williams cannot sustain any of her claims against Grimes or Columbia Staffing. Though both defendants individually exhibited sufficient control over her to be her employer, they did not exhibit the same control over one another. Grimes was not Columbia Staffing's agent, or vice versa. In their individual capacity, the conduct of each defendant does not warrant the imposition of civil liability under federal or state law. Accordingly, it is

**ORDERED** that the defendants' motions for summary judgment are granted.

**IT IS SO ORDERED.**