2010 OK CIV APP 84

**Brenda FULTON, Plaintiff/Appellant,**

v.

**PEOPLE LEASE CORPORATION and Mark Findley, Defendants/Appellees,**

and

**Ervin Findley Trucking, Inc., Defendant.**

**No. 106,675.**

Court of Civil Appeals of Oklahoma, Division No. 1.

March 5, 2010.

Certiorari Denied May 17, 2010.

Mark Hammons, Tamara L. Gowens, Hammons, Gowens & Associates, Oklahoma City, Oklahoma, for Plaintiff/Appellant.

Debra W. McCormick, Kyle L. Buchanan, Rubenstein, McCormick & Pitts, PLLC, Edmond, Oklahoma, for Defendant/Appellee PeopLease Corporation.

David P. Hartwell, Oklahoma City, Oklahoma, and Patricia A. Kirch, Oklahoma City, Oklahoma, for Defendant/Appellee Mark Findley.

WM. C. HETHERINGTON, Judge.

¶1 Brenda Fulton (Plaintiff) appeals two trial court orders entered in her hostile work environment and retaliatory discharge action against Ervin Findley Trucking, Inc. (EFI), Mark Findley, and PeopLease Corporation (PeopLease).[1] The first order sustained Findley's separate motions to dismiss. The second order granted PeopLease's motion of summary judgment, after which Plaintiff dismissed her claims against EFI. The two orders and dismissal, taken together, effectively disposed of all of her claims against all of the parties.

¶2 We reverse the trial court's dismissal of Findley as to Plaintiff's theory of tortious interference of economic relations and affirm the order in all other respects. Because our review of the record reveals disputed material facts which preclude summary judgment, the trial court's summary judgment order in favor of PeopLease is also reversed and the case is remanded for further proceedings.

### THE FACTS

¶3 On March 16, 2008, Plaintiff filed a petition in Oklahoma County District Court against Mark Findley, "the operations manager of [EFI]," and EFI and PeopLease, corporations "doing business in [Oklahoma]." Under the paragraph entitled "Jurisdiction," she alleged "gender discrimination, sexual harassment, hostile work environment, and retaliation in employment which conduct also constitutes for **Burk** tort for (sic) a violation of Oklahoma's public policy against gender discrimination, sexual harassment and retaliation." (Emphasis in original.) In the same paragraph, she further alleged "[a]ll of [her] gender related claims are prohibited by the Fourteenth Amendment of the United States Constitution, Title VII and Oklahoma Public Policy."[2]

---

1. In the body of the opinion, we use the correct spelling of Appellee's name, "PeopLease Corporation," which error is first pointed out in its Response to the Petition in Error. *See Wilson v. Wilson,* 1999 OK 65, n. 1, 987 P.2d 1210. In Plaintiff's response to this Court's show cause order, she explains there was no entity known as "Ervin Findley Trucking, Inc.," she did not learn EFI was "the real party in interest" until the summary judgment process, EFI had by then filed for bankruptcy, and EFI received its discharge after entry of the summary judgment order.

2. "Title VII" refers to "Title VII of the Civil Rights [Act] of 1964, 42 U.S.C. §§ 2000e to 2000e–17." *See Shirazi v. Childtime Learning Center, Inc.,* 2009 OK 13, n. 1, 204 P.3d 75, 79. Federal courts do not have exclusive jurisdiction to enforce Title VII claims. *See Miner v. Mid–*

¶ 4 Plaintiff specifically alleges she was "hired for Defendants" during which employment she was sexually harassed on a daily basis by Jimmy Thames (Thames) a male co-worker, who made sexual threats and subjected her to internet pornography and made inappropriate, offensive and sexual comments about other women in her presence. When Thames ignored her requests to stop, she reported his behavior to Findley during the first week of her employment.

¶ 5 Plaintiff claims she reported Thames' behavior to Findley two weeks and one week before her termination on May 12, 2006. A few days after a third complaint, Findley retaliated with allegations that she had failed to dock her pay for one day of sick leave, which "claimed reason was pretextual" according to Plaintiff. Plaintiff was terminated a few days later without an explanation.

¶ 6 EFI and PeopLease filed separate answers, in which each defendant specifically denied Plaintiff's allegations and raised identical affirmative defenses, including "Plaintiff was employed at will." Findley filed a Special Appearance and Motion To Dismiss, arguing there is no individual liability in Title VII cases. Plaintiff opposed his motion, claiming federal law does not control her state common law tort claim based on public policy. Findley replied,[3] arguing Plaintiff's state tort claim is precluded by an adequate federal statutory remedy for wrongful discharge. The trial court apparently sustained Findley's motion by minute order.[4] Prior to entry of a formal order, the court gave Plaintiff leave to amend her petition, which she did by adding two alternative theories of recovery against Findley, interference with

economic relations and malicious wrong, and alleging his actions "were not in good faith, were for the intention to cause harm, were contrary to Oklahoma's public policy and were not for any legitimate purpose of the business enterprise." [5]

¶ 7 Findley specially appeared and moved to dismiss the amended petition, arguing the new theories of recovery require rights or relations which an at-will employee does not possess. After Plaintiff opposed the motion and Findley filed a reply brief, the trial court filed a Journal Entry of Judgment sustaining Findley's motions to dismiss.

¶ 8 Discovery after these dismissals revealed the following undisputed facts. Mark Findley is the general manager/vice president for EFI, a trucking company owned by his father, Ervin Findley. PeopLease is a personnel leasing company based in South Carolina which has a "Service Agreement" to lease its employees to EFI, executed by Ervin Findley, as President of EFI. Pursuant to the EFI–PeopLease Service Agreement, PeopLease leased Plaintiff to EFI to work as an office assistant on February 27, 2006, which position she held until terminated on May 12, 2006.

¶ 9 PeopLease later moved for summary judgment, denying liability because it was not Plaintiff's single employer under Title VII. Even if it were, PeopLease argued it had no notice of Plaintiff's harassment complaints because she failed to report directly to PeopLease as required by its rules and procedures. Plaintiff responded with additional evidentiary material to support her argument, *inter alia,* PeopLease qualified as an employer under Title VII because it had

America Door Co., 2003 OK CIV APP 32, ¶ 28, 68 P.3d 212, 220 (relying on *Yellow Freight System, Inc. v. Donnelly,* 494 U.S. 820, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990)).

3. In his reply brief, Findley attached, as the only material beyond the pleadings, a copy of a "Dismissal and Notice of Rights" from the Oklahoma City office of the U.S. Equal Employment Opportunity Commission (EEOC) to demonstrate to the trial court Plaintiff's counsel's "misstatement" in her response brief that a no right to sue letter had been issued. We do not treat Findley's motion to dismiss as a motion for summary judgment because he made no argument for dismissal based on that notice.

4. We say "apparently" because the minute order was not included in the appellate record. However, each party admitted the trial court filed a minute order in favor of Findley. See Plaintiff's Amended Motion to Settle the Journal Entry and Findley's Response to that motion.

5. Plaintiff, although acknowledging the trial court's dismissal of "her claim of individual liability for *Burk* actions," reasserted "such claim in this amended pleading solely for the purpose of preserving the issue for appeal."

retained control over her employment with EFI. Based on the briefs and relevant law, the trial court entered summary judgment in favor of PeopLease, without specifying the bases for its decision. Following the filing of the trial court's order and dismissal of EFI, Plaintiff filed this appeal.[6]

## THE APPEAL

### FINDLEY'S MOTIONS TO DISMISS

### STANDARD OF REVIEW

¶10 Appellate review of a trial court order dismissing a case for failure to state a claim upon which relief can be granted is *de novo*. *Fanning v. Brown*, 2004 OK 7, 85 P.3d 841. Reviewing a motion to dismiss to determine whether a petition is legally sufficient requires that we take as true all of the challenged pleading's allegations and all reasonable inferences which may be drawn from them. *Id.* "A pleading must not be dismissed for failure to state a legally cognizable claim unless the allegations indicate beyond any doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Frazier v. Bryan Memorial Hospital*, 1989 OK 73, ¶13, 775 P.2d 281, 287. A plaintiff is required neither to identify a specific theory of recovery nor to set out the correct remedy or relief to which he may be entitled. *May v. Mid–Century Ins. Co.*, 2006 OK 100, ¶10, 151 P.3d 132, 136. If relief is possible under any set of facts which can be established and is consistent with the allegations, a motion to dismiss should be denied. *Id.* The party moving for dismissal pursuant to 12 O.S.2001 § 2012(B)(6) has the burden to show the legal insufficiency of the petition. *Indiana National Bank v. State of Oklahoma, Dept. of Human Services*, 1994 OK 98, 880 P.2d 371.

*Lack of Individual Liability*

¶11 Findley argues he should be dismissed because individual liability suits are not permitted in Title VII cases. Plaintiff expressly agrees as to this dismissal, but states "at present, [her] claims arise *solely* under the public policy announced in Oklahoma's Anti-Discrimination Act (OADA), 25 O.S.2001 § 1101 *et seq.*" (Emphasis added.) Her claim is a common-law *Burk* tort arising out of OADA.[7]

¶12 Plaintiff's sole argument against Findley's dismissal is, unlike the federal law, the OADA does permit suits against individuals, because § 1301(1) defines "employer" as "a person who has fifteen or more employees ... [including] an agent of such a person"[8] and "person," as defined in § 1201(5), includes "an individual." Without addressing these definitions, Findley replies he can not be Plaintiff's "employer" for purposes of the OADA "since he was her supervisor and fellow employee of one of the corporate Defendants."

¶13 A similar argument against individual liability in a *Burk* tort claim has been addressed by another panel of the same division of the Court of Civil Appeals in *Eapen v. McMillan*, 2008 OK CIV APP 95, 196 P.3d 995. The plaintiff in *Eapen* filed a petition in state court alleging racial and national origin discrimination, hostile work environment, disparate treatment and wrongful termination against his supervisor at Dell Marketing L.P. The defendant moved to dismiss, arguing the plaintiff's public policy *Burk* tort claim did not extend to include individual liability.

¶14 The *Eapen* Court reviewed the supervisor's argument under the standard of re-

---

6. On December 8, 2009, this Court issued an order directing Plaintiff to show cause why this appeal should not be dismissed as premature because PeopLease's motion for summary judgment addressed only issues concerning its lack of liability as an employer under Title VII. Plaintiff timely responded asserting "the Order on Summary Judgment did have the effect of disposing of all remaining claims as to all remaining defendants.

7. *See Burk v. K–Mart*, 1989 OK 22, 770 P.2d 24.

8. "Employer" means "a person who has fifteen or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year, or a person who as a contractor or subcontractor is furnishing the material or performing work for the state or a governmental entity or agency of the state and includes an agent of such a person but does not include an Indian tribe or a bona fide membership club not organized for profit."

view for a motion for summary judgment and held:

> We glean no "clear mandate" of public policy imposing individual liability for tort discharge under § 1301(1) and *Saint.* Contrary to Eapen's position, § 1301(1) does not provide the "clear mandate" required to extend *Burk* to the point that a co-worker or supervisor in the workplace would be individually liable for a public policy tort. At present, nothing in *Burk* or its progeny seems to extend the concept of "employer" that far. The trial court's decision dismissing Eapen's *Burk*-tort claim is affirmed. *Id.*, 2008 OK CIV APP 95, ¶ 11, 196 P.3d at 998.

Because § 1201(5), as argued by Plaintiff, was not discussed in *Eapen,* we will consider it in conjunction with § 1301 to determine if Plaintiff's interpretation has merit.

¶ 15 Statutory interpretation presents a question of law. *Fanning v. Brown,* 2004 OK 7, 85 P.3d 841. The fundamental rule of statutory construction is to ascertain and give effect to the legislative intent, first sought in the language of a statute. *Id.* Courts will give the words of a statute a plain and ordinary meaning, unless a contrary intention plainly appears. *Id.* When the language of a statute is plain and unambiguous, no occasion exists for application of rules of construction, and the statute will be accorded meaning as expressed by the language employed. *City of Durant v. Cicio,* 2002 OK 52, 50 P.3d 218. We must consider the statute as a whole, not just individual provisions. *Bank of Oklahoma, N.A. v. Welco, Inc.,* 1995 OK CIV APP 43, 898 P.2d 172.

¶ 16 The stated purpose of the OADA is to implement the policies embodied in several federal statutes, including Title VII. *See* § 1101(A) and *Tate v. Browning–Ferris, Inc.,* 1992 OK 72, 833 P.2d 1218. Pursuant to § 1101(B), the OADA "shall be construed according to the fair import of its terms and shall be liberally construed to further the general purposes stated in this section and the special purposes of the particular provision involved."

▮ ¶ 17 The majority of federal circuit courts hold that relief granted under Title VII is against the employer, *not* individual employees whose actions constitute a violation of the Act. *Haynes v. Williams,* 88 F.3d 898, 899 (10th Cir.1996). "The proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly." *Sauers v. Salt Lake County,* 1 F.3d 1122, 1125 (10th Cir.1993); *see also Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 72 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986) ("Congress' decision to define "employer" to include any "agent" of an employer, 42 U.S.C. § 2000e(b), surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible.")

▮ ¶ 18 We conclude the Legislature did not intend to make individual employees personally liable for discrimination actions brought under the OADA, which intent is apparent from a clear reading of § 1301(1) and § 1201(5) of the OADA. Section 1302 of the OADA prohibits discriminatory practices by an "employer." "Employer" is defined in § 1301(1) as "a person with more than 15 employees" and "an agent of such a person" Under § 1201(5) of the OADA, "person" includes an "individual" and a long list of entities commonly having employees.[9] Interpreting these statutes, together, the Legislature's inclusion of "individual" simply recognizes that an individual or sole proprietor with the requisite number of employees may too qualify as an "employer" for purposes of liability under the OADA.

¶ 19 Based on the foregoing analysis, we conclude the addition of § 1201(5) re-enforces the holding in *Eapen* that there is currently no clear mandate of public policy imposing individual liability in *Burk* tort claims. As a result, we affirm the trial

---

9. Section 1201(5)'s definition of "person" also includes an "association, corporation, joint apprenticeship committee, joint-stock company, labor union, legal representative, mutual company, partnership, receiver, trust, trustee, trustee in bankruptcy, unincorporated organization, any other legal or commercial entity, the state, or any governmental entity or agency."

court's dismissal of Findley from Plaintiff's Title VII and OADA based *Burk* tort claims.

### Failure to State a Claim For Intentional Interference with Economic Relations

¶ 20 In Plaintiff's amended petition, she alleges Findley is individually liable because "his actions constitute an *interference with* Plaintiff's *economic relationship* with both [EFI] *and* [PeopLease]." (Emphasis added.) For dismissal of this theory, Findley argues: (1) Plaintiff has no "business or economic right or relations" with which he could have interfered because she is an at-will employee, and (2) she has no employment contract. He relies on *Ellison v. An–Son Corp.,* 1987 OK CIV APP 71, ¶ 13, 751 P.2d 1102, 1106, for the following elements for "malicious interference with business or contract relations":

1. That he or she had a *business or a contractual* right that was interfered with.

2. That the interference was *malicious and wrongful,* and that such interference was *neither justified, privileged nor excusable.*

3. That damage was proximately sustained as a result of the complained of interference. (Emphasis added)

Specifically limiting his argument to the first element, Findley contends Plaintiff is in the same position as the plaintiff in *Ellison,* whose interference claim was dismissed for lack of a business or contractual right to a lease of Indian land.

¶ 21 Findley argues the Court in *Martin v. Johnson,* 1998 OK 127, 975 P.2d 889, "did not hold that an at-will employee like [Plaintiff] may bring such suit. Instead, the holding in *Martin* and all similar cases in Oklahoma is that an employment contract must first exist before tortious interference with it can occur." He then distinguishes the non-tenured teacher in *Martin* who had an employment contract from Plaintiff here, who he claims is

an at-will employee with no employment contract. Findley finally argues there is no authority in Oklahoma recognizing a cause of action for interference with business or economic relations in the context of an employee who is terminated by her superior, relying on *Overbeck v. Quaker Life Ins. Co.,* 1984 OK CIV APP 44, 757 P.2d 846.

¶ 22 Plaintiff disagrees, claiming "it is clear" *Martin* does apply to at-will employment because the teacher was non-tenured and the interference occurred *after* expiration of her contract. She asserts *Overbeck* dealt only with *prospective economic relations* and not with interference of an *existing* contract. This specific distinction was recognized by the Court in *McNickle v. Phillips Petroleum Co.,* 2001 OK CIV APP 54, 23 P.3d 949, when holding an at-will employment relationship may be subject to tortious interference.

¶ 23 Plaintiff further asserts "employment" is a "business or contractual" right even if it is at-will, relying on *Groce v. Foster,* 1994 OK 88, ¶ 8, 880 P.2d 902, 905, for holding "[i]n an at-will employment setting the relationship between the employer and employee is contractual or promise-based—express or implied." She relies not only on federal authorities [10] but also the earliest Oklahoma cases recognizing interference with contractual rights and discussing its application in at-will employment relationships. *See Schonwald v. Ragains,* 1912 OK 210, ¶ 27, 32 Okla. 223, 122 P. 203, 210 and *Stebbins v. Edwards,* 1924 OK 227, 101 Okla. 188, ¶ 5, 224 P. 714, 715.

¶ 24 Findley concedes a "third party" to an at-will employment relationship may be liable for interference with such relationship "in some situations," but reasserts *Martin* does not support an action for interference by an at-will employee with no employment contract. Findley then argues for the first time "actions for *tortious* interference with business relationships **must be brought against a person who is not a party to the at-will**

10. Plaintiff relies on *Truax v. Raich,* 239 U.S. 33, 38, 36 S.Ct. 7, 60 L.Ed. 131 (1915)("the unjustified interference of third persons is actionable although the employment is at will"), *Haddle v. Garrison,* 525 U.S. 121, 126–127, 119 S.Ct. 489, 142 L.Ed.2d 502 (1998)("third party interference with at-will employment has long been a compensable injury under tort law"), and *Worrell v. Henry,* 219 F.3d 1197, 1214, n. 4 (10th Cir. 2000)("an at-will employee who has no wrongful termination against his employer may still be able to assert an intentional interference claim against a third party").

relationship" and "[he] was Plaintiff's supervisor ... not a third party to her employment relationship."

¶ 25 Based on the pleadings and the parties' arguments for dismissal, the dispositive legal issue is whether Plaintiff, an at-will employee, possessed any right at the time of her termination which, under Oklahoma law, would qualify her for protection from an interference with her "economic relations with EFI and PeopLease." Before proceeding with our analysis, we clarify several preliminary matters.

¶ 26 Plaintiff does not allege an express contract or implied promise for a definite term of employment. There are no allegations in her petitions explaining her exact relationship with EFI and PeopLease. Considering her argument against dismissal based on at-will employment and supporting authorities, we assume as does Findley, Plaintiff is an at-will employee for purposes of deciding whether the trial court correctly dismissed her "interference with economic relations" theory against Findley.

¶ 27 We note "the terms 'malicious interference,' 'intentional interference,' and 'tortious interference' with contract or business relations have been used interchangeably in Oklahoma jurisprudence, and do not designate distinct torts." *Tuffy's Inc. v. The City of Oklahoma City*, 2009 OK 4, ¶ 15, 212 P.3d 1158, 1166. However, because Plaintiff has specifically pled "interference with *economic* relations," we deem it necessary to clarify the often confusing and poorly pled available options in Oklahoma.

¶ 28 The Supreme Court recently explained "the intentional tortious interference claims" Oklahoma has long embraced are found in Restatement (Second) of Torts (R.S. Torts) § 766, which "applies to interference with a third party's performance of an existing contract," and § 766B, which "applies to interference with prospective contractual relations not yet reduced to contract." *Wilspec Technologies, Inc. v. DunAn Holding Group, Co., Ltd.*, 2009 OK 12, ¶ 6–7, 204 P.3d 69, 71.

However, these torts are not synonymous. *Overbeck*, ¶ 6, 757 P.2d at 848.

¶ 29 Claims covered by R.S. Torts § 766 are most commonly referred to by Oklahoma Courts as "interference with contract or business relations." *Mac Adjustment Inc. v. Property Loss Research Bureau*, 1979 OK 41, 595 P.2d 427. Numerous name variations for this tort action are pled based upon specific facts alleged in each case, including "interference with contract," *e.g. Voiles v. Santa Fe Minerals, Inc.*, 1996 OK 13, 911 P.2d 1205, "interference with contractual relationship," *e.g. Morrow Development Corp. v. American Bank & Trust Co.*, 1994 OK 26, 875 P.2d 411, "interference with business relationship," *e.g. Waggoner v. Town & Country Mobile Homes, Inc.*, 1990 OK 139, 808 P.2d 649, and "interference with business relations," *e.g. Green Bay Packaging Inc. v. Preferred Packaging Inc.*, 1996 OK 121, 932 P.2d 1091. However, the terms "contract or contractual relations" are not synonymous with "business relations or business relationship." *See OUJI—Civil No. 24.1.* The former terms refer to a wrongful interference with an *existing* contract while the latter terms refer to an interference with an *existing* business relationship.

¶ 30 When addressing *prospective* contractual relations, claims under R.S. Torts § 766B, Oklahoma courts have consistently used "interference with prospective *economic* advantage," *see Brock v. Thompson*, 1997 OK 127, n. 58, 948 P.2d 279, and *Crystal Gas Co. v. Oklahoma Natural Gas Co.*, 1974 OK 34, 529 P.2d 987, or "interference with prospective economic *relations*," *see Gaylord Entertainment Co. v. Thompson*, 1998 OK 30, n. 96, 958 P.2d 128. "Interference with a prospective economic **advantage** usually involves interference with some type of reasonable expectation of profit." *Overbeck*, ¶ 4, 757 P.2d at 847.

¶ 31 Our research of published Oklahoma cases reveals "interference with *economic relations* " was used synonymously with "interference with *prospective business relations* " in Findley's authority, *Ellison v. An–Son Corp.*, 1987 OK CIV APP 71, 751 P.2d 1102.[11]

11. The *Ellison* Court used both "interference with economic relations" and "interference with prospective business relations" to describe the defendant's counterclaim, but applied the ele-

Plaintiff initially alleged "interference with *economic relations.*" She does not question the applicability of the "malicious interference with contractual or business relations" elements from *Ellison.* She also distinguished *Overbeck,* arguing it did not deal with "interference with *existing* relations." Based on this discussion, we treat the theory she specifically pled against Findley, "interference with economic relations with EFI and PeopLease," as one for "interference with an existing contract or business relations." We now turn to the dispositive issue, whether Plaintiff possesses any contract or business right in her at-will employment relationship protected from intentional or tortious interference under Oklahoma law.

¶ 32 Findley essentially argues the non-tenured teacher in *Martin* was *not* an at-will employee,[12] because her contract was in writing and provided for a definite duration of employment. However, Plaintiff's "hiring" by EFI and PeopLease in this case would qualify as an employment contract for an indefinite period. *Corder v. Oklahoma Medical Research Foundation,* 1999 OK CIV APP 33, 980 P.2d 1122.

¶ 33 As between an employer and employee, Oklahoma Courts have long recognized "the basic principle that an employment contract of indefinite duration may be terminated without cause at any time without incurring liability for breach of contract. Such *indefinite employment contracts* are deemed terminable-at-will." (Emphasis added.) *Burk v. K–Mart Corp.,* 1989 OK 22, ¶ 5, 770 P.2d 24, 26. But, an employer's termination of an at-will employee in contravention of a clear mandate of public policy is a tortious breach of *contractual obligations.* *Id.* at ¶ 17.

¶ 34 At issue here is not a *Burk* tort claim against either of Plaintiff's employers, but instead whether Oklahoma recognizes an action for intentional interference with the employment contract brought by a discharged at-will employee against her supervisor.

Plaintiff's authorities generally support recognition of such an action against third parties who interfere with an at-will employment. *See McNickle v. Phillips Petroleum Co.,* 2001 OK CIV APP 54, ¶ 10, 23 P.3d 949, 952 ("In the evolution of the tort of interference with the employment contractual relationship in Oklahoma, there is nothing to suggest that the tort would not apply in cases of interference with an at-will contract of employment when the party interfering acts without privilege.") R.S. Tort § 766 explains that a defendant may not improperly interfere with *"a contract"* that, by its terms or otherwise, permits the third person *to terminate the agreement at will.* Until he has so terminated it, the contract is valid and subsisting. See Comment f and g.

¶ 35 Identification of the proper defendant, as Findley's last argument challenges, becomes the next inquiry for tortious interference claims in the context of at-will employment. When answering a certified federal question concerning whether this state adopts R.S. Torts § 766A, the *Wilspec* Court cited *Schonwald v. Ragains,* 1912 OK 210, 32 Okla. 223, 122 P. 203, as the earliest of four Oklahoma cases which "[f]or the past seventy-five years, and well before the passage of § 766A in 1979 ... has repeatedly protected contractual relationships between parties from unprivileged, unjustified, and inexcusable interference from *one who is not a party* to the contract or business relation." (Emphasis added.) *Wilspec,* ¶ 11, 204 P.3d at 73.

¶ 36 We conclude *Martin* applies when determining whether an employer's supervisor or other agent will be considered a party to the employment contract. The non-tenured teacher in *Martin* filed her action against the school district, the school district's superintendent and its principal *after* the teacher's employment contract with the school district was not renewed. Alleging her resistance to the principal's advances was the reason for the non-renewal, the teacher pled several theories of recovery, including

---

ments of "malicious interference with business or contract relations". *Id.,* ¶ 13, 751 P.2d at 1106.

**12.** Contrary to Plaintiff's argument, the exact timing of the alleged interference is not specified in *Martin.* Nor are the precise terms and conditions of the non-tenured teacher's contract explained.

conspiracy, sexual harassment, and tortious interference with her contract. The defendants moved to dismiss the latter theory of recovery, arguing the principal and superintendent were "agents" of the school district and could not interfere with her contract. The teacher resisted the motion, arguing the theory was viable if the individual defendants were acting outside the scope of their employment or contrary to the interest of the school district. After the trial court granted the dismissal motion, the teacher moved to amend her petition, which the trial court allowed except for her tortious interference with contract theory.

¶ 37 When addressing the teacher's appeal of the order refusing her leave to amend the petition as to this theory, the *Martin* Court limited the issue to whether the petition could be amended to state a claim for relief against the *individual* defendants based upon the tort of interference with contract. The Court found the issue of "whether an agent could be held personally liable on an interference with contract claim if the agent was acting against the principal's interests and in furtherance of the agent's interests" had not been addressed. *Id.*, 1998 OK 127, ¶ 30, 975 P.2d at 896.

¶ 38 The *Martin* Court recognized the issue had been addressed by the Tenth Circuit in the context of officers, agents or employees of a corporation interfering with the corporation's contract in *Mason v. Oklahoma Turnpike Authority*, 115 F.3d 1442 (10th Cir. 1997). After acknowledging federal court holdings on state law matters have no precedential value, the *Martin* Court nevertheless agreed with the Tenth Circuit that in Oklahoma an officer's interference with the corporation's contract will be privileged *only if* done in good faith. The *Martin* Court then held:

> It is fundamental that an employee or agent must act in good faith and in the interest of the employer or principal. If an employee acts in bad faith and contrary to the interests of the employer in tampering with a third party's contract with the employer we can divine no reason that the employee should be exempt from a tort claim for interference with contract.

(Cites and footnote omitted; emphasis added.) *Martin*, 1998 OK 127, ¶ 32, 975 P.2d at 896–897.

Because the trial court had dismissed the plaintiff's tortious interference claim based on the defendant's legal argument without addressing the sufficiency of her proposed allegations, the *Martin* Court reversed the trial court's order which had prohibited plaintiff from amending her tortious interference claim against the two employees of the school district.

¶ 39 Since *Martin*, *Eapen v. McMillan*, 2008 OK CIV APP 95, 196 P.3d 995, discussed above, specifically answered the question. The employee sued his supervisor alleging racial discrimination. The Court in *Eapen* reversed the trial court's dismissal of the employee's tortious interference with contract theory as between the employee and the supervisor. Relying on *Martin*, the Court in *Eapen* concluded the supervisor's racial slurs and discriminatory behavior toward him were done in bad faith and then held, "[g]iven the facts alleged by Eapen and the exception in *Martin*, there is a legal basis for Eapen's tortious interference claim." *Id.*, ¶ 15, 196 P.3d at 998.

¶ 40 In this case, Plaintiff alleges in her amended petition that Mark Findley failed to stop the sexual harassment about which she made three complaints and he responded to her last complaint by claiming she failed to dock her pay for sick leave. Because "this claimed reason was pretextual," "retaliatory," and resulted in her termination the next day, Plaintiff alleges Findley's actions were "not in good faith" and "not for any legitimate purpose of the business enterprise." Taking the allegations in Plaintiff's amended petition as true, we conclude, based on *Martin* and *Eapen*, the trial court erred in dismissing Plaintiff's tortious interference theory of recovery against Mark Findley.

### Failure to State a Claim for Malicious Wrong

¶ 41 For dismissal of Plaintiff's alternative theory of recovery, Findley argues the "archaic tort" of malicious wrong was last recognized by Oklahoma courts over half a

century ago. Relying primarily on *Hibbard v. Halliday*, 1916 OK 649, 58 Okla. 244, 158 P. 1158, he claims its application was limited to injuries to property rights, which he claims is lacking in Plaintiff's at-will employment. Since its last application, Findley contends this tort "has been replaced by statutory schemes governing wrongful conduct." He finally claims "Oklahoma does not and would not" apply the tort in the context of employment discrimination for which there are adequate legal remedies.

¶ 42 Both parties acknowledge, the tort of "malicious wrong" was first discussed in *Mangum Electric Co. v. Border*, 1923 OK 547, ¶ 9, 101 Okla. 64, 222 P. 1002, 1005, as follows:

> [t]he intentional doing of that which is calculated in the ordinary course of events to damage, and which does, in fact, damage another, or that other person's property or trade is actionable, if done without just cause or excuse. Such intentional action when done without just cause or excuse is what the law calls a **malicious wrong.** (Emphasis added.)

After pointing out the *Mangum* Court's definition of malicious wrong was subsequently recognized by the Court in *Ward v. First National Bank*, 1937 OK 449, 180 Okla. 395, 69 P.2d 1041, Plaintiff argues Oklahoma has "expressly adopted the [R.S. Torts] § 870 cause of action."

¶ 43 Although we agree with Findley there is no express adoption of the R.S. Torts § 870 in either *Ward* or *Mangum*, there are similarities between the two torts. Section 870, entitled "Liability for Intended Consequences–General Principle," provides, "[o]ne who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances." Intentional conduct "when done without just cause or excuse," as required for a malicious wrong claim, clearly equates to conduct that is "not justifiable."

¶ 44 Further comparison of the two torts reveals the *Mangum* Court's definition of "malicious wrong" has a significantly broader reach of rights or interests sought to be protected from intentionally-caused harm or injury than provided by § 870. Whereas the latter applies to injury or harm to "another," the tort of malicious wrong encompasses not only damages to "another," but also "to that other person's property or trade." [13]

¶ 45 The *Mangum* Court, after recognizing other states' definitions of "malicious wrong" and "a wrongful act", held "[i]t is a well settled rule of law in this class and character of cases that 'malice' is an essential ingredient in an action for damages, and 'malice' is defined as the intentional doing of a wrongful act done intentionally, **without** just cause or excuse." *Id.*, 1923 OK 547, ¶ 11, 101 Okla. 64, 222 P. 1002.

¶ 46 For the definition of "malice," the *Mangum* Court relied on *Schonwald v. Ragains*, 1912 OK 210, 32 Okla. 223, 122 P. 203, which first applied the tort of "malicious interference with contract," expressly holding "it is an actionable tort for one to *maliciously* interfere with a contract between two parties, and induce one of them to break that contract, to the injury of the other." *Id.*, ¶ 0. The *Schonwald* Court further explained "[b]y the term 'malicious' we do not mean that defendants were actuated by motives of ill will against [plaintiff] personally, but by it is meant an unreasonable and wrongful act done intentionally, **without** just cause or excuse." (Emphasis added.) *Id.*, ¶ 31.

¶ 47 Four years later, *Hibbard* was decided. The Court held that a wall constructed in such a manner as to interfere with the enjoyment of adjoining property constituted an actionable wrong, based in part on the principal "at common law there was a cause of action, whenever one person did damage to another willfully and intentionally, and without just cause or excuse." *Hibbard*, ¶ 6–7.

¶ 48 As *Schonwald* and *Hibbard* demonstrate, the more specific tort of malicious or

---

**13.** These "property interests" are actually covered by R.S. Torts § 871, which provides, "[o]ne who intentionally deprives another of his legally protected property interest or causes injury to the interest is subject to liability to the other if his conduct is generally culpable and not justifiable under the circumstances."

intentional interference of contract or property, discussed above, developed from the common law general tort of malicious wrong. In each case, despite the availability of the general tort, the Court adopted and applied the specific tort for an intentional interference "with contract" or "with real property" to the respective facts, right or interests specifically alleged in the plaintiffs' petitions. In *Mangum*, when the Court was later presented with allegations of malicious and wrongful conduct which did not involve an interference with either a contract or property, but instead injury or damage to the plaintiff's profession, the Court applied the general "malicious wrong" theory.

¶ 49 Our Court's recognition and application of these two torts as distinct and independent torts is supported by the Introductory Note for R.S. Torts § 766, which states, "[§ 870] presents a generalization affording guidance regarding the treatment of intentional torts *outside* the scope of the established, crystallized torts." *See also* Comment (a) to R.S. Torts § 870 ("It is intended to serve as a guide for determining when liability should be imposed for harm that was intentionally inflicted, even though the conduct does not come within the requirements of one of the well established and named intentional torts.")

¶ 50 We recognize a plaintiff need not specify a theory or remedy to survive a motion to dismiss, but in this case, Plaintiff pled the more specific tort of interference with economic relations and, *in the alternative*, the general tort of malicious wrong. The above discussion leads us to conclude we find no fault with the dismissal below of the general tort of malicious wrong.

### PEOPLEASE'S MOTION FOR SUMMARY JUDGMENT

### STANDARD OF REVIEW

¶ 51 In determining whether summary adjudication was appropriate, we must examine the pleadings, depositions, affidavits and other evidentiary materials submitted by the parties and affirm if there is no genuine issue as to any material fact and PeopLease was entitled to judgment as a matter of law.

*Perry v. Green*, 1970 OK 70, 468 P.2d 483. All inferences and conclusions to be drawn from the evidentiary materials must be viewed in a light most favorable to Plaintiff. *Ross v. City of Shawnee*, 1984 OK 43, 683 P.2d 535. We are limited to the issues actually presented below, as reflected by the record which was before the trial court rather than one that could have been assembled. *Frey v. Independence Fire and Casualty Company*, 1985 OK 25, 698 P.2d 17.

¶ 52 Summary judgment should be granted only if it is perfectly clear that there is no material fact at issue. *Northrip v. Montgomery Ward and Co.*, 1974 OK 142, 529 P.2d 489. For summary judgment to be appropriate, the trial court must not only find there is no substantial controversy as to any material fact, but also that reasonable people could not reach differing conclusions from the undisputed facts. Even if the trial court anticipates that a directed verdict will be necessary, summary judgment must not deprive a litigant of the right to a jury trial of disputed facts. *Flanders v. Crane Co.*, 1984 OK 88, 693 P.2d 602.

¶ 53 To prevail as the moving party on a motion for summary adjudication, one who defends against a claim by another must either (a) establish that there is no genuine issue of fact as to at least one essential component of the plaintiff's theory of recovery or (b) prove each essential element of an affirmative defense, showing in either case that, as a matter of law, the plaintiff has no viable cause of action. *Akin v. Missouri Pacific R. Co.*, 1998 OK 102, 977 P.2d 1040.

### *Status as an Employer for Liability under Title VII*

¶ 54 We note at the outset, PeopLease "disputes Plaintiff suffered sexual discrimination, harassment or retaliation at the hands of EFI or its employees." For purposes of this summary judgment motion only, PeopLease "assumes that such Title VII violations did occur" at EFI and does not challenge by summary judgment the existence of prima facie facts for hostile work environment, sexual harassment and retaliatory discharge.

268

¶ 55 After conceding "both [it] and [EFI] were dual employers of [Plaintiff]" under Title VII's definition of "employer,"[14] PeopLease argues that it cannot be held jointly and severally liable for EFI's alleged Title VII violations unless Plaintiff shows EFI and PeopLease *together* were Plaintiff's "single employer." This argument seeks to eliminate the threshold issue whether PeopLease, the entity which leased Plaintiff to EFI, also qualifies as her employer under Title VII. Our research reveals no Oklahoma state court authority in the context of this case involving an employee *leasing* company.

¶ 56 Under Title VII, it is an unlawful employment practice for an *employer* to "discriminate against any individual ... because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). This federal statute prohibits sexual harassment which subjects an employee to a hostile work environment. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

¶ 57 "Title VII's anti-retaliation provision forbids *employer* actions that 'discriminates against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids ..." *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 59, 126 S.Ct. 2405, 2410, 165 L.Ed.2d 345 (2006). A private right of action for retaliatory discharge, which may be brought and enforced in Oklahoma state courts, is separate from a claim for gender discrimination. *Miner v. Mid–America Door Co.,* 2003 OK CIV APP 32, 68 P.3d 212.

¶ 58 PeopLease argues it and EFI should not be considered as one employer, because there is no evidentiary support for the following factors of the single employer test: (1) interrelated operations, (2) common ownership, (3) common management, and (4) centralized control over labor relations. Relating to the last factor, PeopLease claims it is undisputed "EFI retained complete control over [Plaintiff], including decisions to hire, assign work, discipline, and/or terminate her," while PeopLease "provided payroll administration and benefit services to EFI employees and staff."

¶ 59 PeopLease's sole authority for this argument is *Lambertsen v. Utah Department of Corrections,* 79 F.3d 1024, 1029 (10th Cir. 1996), a summary judgment case in which the U.S. Court of Appeals Tenth Circuit affirmed the district court's decision the employer was not liable under the "hybrid test." Acknowledging the "single employer test" had not been raised below nor expressly adopted by the Tenth Circuit, the Court nevertheless found there was no evidence presented on any of that test's four factors.

¶ 60 Plaintiff correctly argues the Tenth Circuit has since replaced the "hybrid test" with the "single-employer test" and the "joint-employer test" in *Bristol v. Board of County Commissioners of the County of Clear Creek,* 312 F.3d 1213, 1218 (10th Cir. 2002).[15] Noting the use of the hybrid test in *Lambertsen* and by the district court in the order on review, the *Bristol* Court explained "[w]e take this opportunity, sitting *en banc,* to clarify that the hybrid test does not provide an appropriate framework in the present situation, where there is no allegation [the plaintiff] is an independent contractor of the Board." *Id.,* at 1218. Unlike the hybrid test, the Court found "both the joint-employer test and single-employer test are designed for situations where there is more than one alleged employer." *Id.* The single-employer test addresses "whether two nominally separate entities should in fact be treated as an integrated enterprise," whereas the joint-employer test "assumes that the alleged employers are separate entities" and analyzes "whether they co-determine the essential terms and conditions of employment." *Id.*

14. Under Title VII, "employer" is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar week in the current or preceding calendar year, and any agent of such a person ..." 42 U.S.C. § 2000e-(b).

15. *Bristol* involved a claim under the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. §§ 12102–12213, filed by a confinement officer against the county board of commissioners and the county sheriff who alleged both defendants were his employers for ADA purposes. In its analysis, the court applied the ADA's definition of "employer," noting it has the same definition in Title VII. *Id.,* 312 F.3d at 1217.

¶ 61 Applying first the "joint-employer test," the *Bristol* Court concluded *"most important* to control over the terms and conditions of an employment relationship is the 'right to terminate' it under certain circumstances." *Id.* Because the State of Colorado's constitution considered the two governmental entities distinct and separate and its statutes gave the sheriff exclusive control over the hiring and firing of its employees, the *Bristol* Court held the board was not liable under the joint-employer test for the negligent acts of the sheriff's employees.

¶ 62 The board's lack of control over the hiring and firing of the sheriff's employees similarly eliminated the most important factor of the "single-employer" test, "centralized control of labor." Declaring the decision whether an entity qualifies as an employer is generally a fact issue for the jury, the *Bristol* Court held "[i]n the instant case, however, our conclusion that neither the joint employer test nor the single-employer test can be satisfied requires judgment as a matter of law." *Id.*, at 1221.

¶ 63 Both tests were later applied in *Sandoval v. City of Boulder, Colorado*, 388 F.3d 1312 (10th Cir.2004), a Title VII action filed by a police department employee against the City of Boulder (City). The employee, who worked in the Boulder Regional Communications Center (BRCC), alleged City was liable for the hiring discrimination by the BRCC Executive Committee. The employee moved for summary judgment, arguing City and BRCC were her "joint employers" or, in the alternative, they constituted a "single employer" for purposes of Title VII liability. The district court disagreed and the employee appealed the summary judgment order in favor of City.

¶ 64 Relying on *Bristol*, the *Sandoval* Court's primary consideration when applying each test was whether City had the right to terminate the employment relationship. *Id.* at 1323–1324. The Court affirmed the summary judgment order, concluding City was not liable under either test because the employee had not demonstrated any disputed

material fact which could show City shared or co-determined hiring or firing decisions for the position she had wanted.

 ¶ 65 In this case, PeopLease attaches no affidavits or other evidentiary material to support that it and EFI are separate entities. If we assume them to be separate entities, we agree with Plaintiff that PeopLease has potential liability under the joint employer test, because it retained control over the essential terms and conditions of her assignment to EFI, including termination and employment discrimination.

¶ 66 To support this argument, Plaintiff attaches the EFI–PeopLease Service Agreement, under which PeopLease "reserves the right of direction and control over Assigned Employees and retains the authority to hire, establish wages, fire, discipline and reassign Assigned Employees" and "shall have the exclusive right to terminate Assigned Employees covered by this Agreement." The control EFI retained was, in relevant part, the "right to seek the termination" of any worker assigned to it by PeopLease, "so long as that … termination instruction does not violate [Title VII] … and any other similar law, rules or regulations governing employment relationships." PeopLease then agrees to provide guidance "regarding compliance with these and other state and federal laws affecting Assigned Employees." This evidentiary material clearly disputes PeopLease's contractual role as merely providing payroll and benefits services [16] to EFI and its employees.

¶ 67 PeopLease contends in its reply brief that the critical issue is which entity made the final decision to terminate, citing a Fifth Circuit case that applied only the single employer test. PeopLease relies on plaintiff's deposition testimony that she reported the harassment and her termination to PeopLease to support its argument that it had a total lack of knowledge or participated in Plaintiff's termination. This, standing alone, does not establish that conclusion as the only reasonable inference.

---

**16.** PeopLease's Welcome Letter lists the benefits leased employees are provided—health, dental and life insurance, 401(K) retirement, insurance premium savings plan and supplemental benefits.

¶ 68 More importantly, PeopLease does not deny or dispute in any way its contractual control and actual participation in prevention of employment discrimination, which policies were part of PeopLease's twenty-two page Standard Employee Handbook provided to Plaintiff on her first day of employment at EFI.

¶ 69 We have found no case dealing with an employee leasing company with this type of contractual control, however, courts have determined temporary employment or personnel agencies and their clients were joint employers and liable for Title VII violations during the employee's period of assignment.[17] *See Mullis v. Mechanics & Farmers Bank,* 994 F.Supp. 680 (M.D.N.C.1997); *Williams v. Grimes Aerospace Co.,* 988 F.Supp. 925 (D.S.C.1997); *Magnuson v. Peak Technical Services, Inc.,* 808 F.Supp. 500 (E.D.Va. 1992); *Amarnare v. Merrill Lynch, Pierce, Fenner & Smith,* 611 F.Supp. 344 (D.C.N.Y. 1984), *affirmed,* 770 F.2d 157 (2nd Cir.N.Y. 1985).

¶ 70 The closest factual scenario to this case is *Williams v. Grimes Aerospace Co.,* 988 F.Supp. 925 (D.S.C.,1997). Although the specifics of the contract between the staffing firm and its client were not discussed, the *Williams* court found a genuine issue of fact existed regarding the staffing firm's status as an employer because the staffing firm "paid [the employee's] wages, benefits and taxes," "handled any complaints [the employee] had regarding her employment status," and "did retain the right to hire and fire [her], the ultimate means of control." *Id.,* 988 F.Supp. at 936. Based on the authorities discussed above and the evidentiary material submitted by the parties, we conclude a genuine issue of fact exists regarding PeopLease's status as Plaintiff's employer under Title VII. To

the extent the trial court determined PeopLease was not an "employer" under the joint employer theory, summary judgment in favor of PeopLease was error.

## IDENTIFICATION OF PEOPLEASE'S EXPOSURE FOR EMPLOYER LIABILITY

¶ 71 Even if it were an "employer" under Title VII, PeopLease argues it cannot be vicariously liable to Plaintiff because the undisputed facts demonstrate a co-worker, not a supervisor, sexually harassed her. It also argues liability under a negligence theory is eliminated because Plaintiff never notified PeopLease of the sexual discrimination complaints until after her termination, which it claims violates PeopLease's rules and procedures. We address these distinct bases for Title VII employer liability under separate headings.

### Title VII Vicarious Liability

¶ 72 Employers are vicariously liable for sexual harassment by a supervisor with immediate or successively higher authority to make a "tangible employment decision" concerning the victimized employee, *e.g.,* discharge, demotion, or undesirable reassignment, only if such action is taken. *Burlington Industries v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *see also Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In this case, it is undisputed that Plaintiff was terminated, so the affirmative defense available to an employer when a supervisor sexually harasses a victim and no tangible employment action is taken does not apply here.[18]

---

17. Title VII defines the term "employment agency" as "any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person," 42 U.S.C. § 2000e-(c), and prohibits as unlawful employment practice when an employment agency fails to refer or refers for employment any individual on the basis of his race, color, religion, sex or national origin. 42 U.S.C. § 2000e-2(b). Plaintiff does not allege any discrimination in PeopLease's referral process. However, employment agencies

may be liable under Title VII's general discrimination statute, 42 U.S.C. § 2000e-2(a)(1) if they are in fact an employer, which issue this appeal raises. See *Williams v. Grimes Aerospace Co.,* 988 F.Supp. 925 (D.S.C.1997).

18. If no tangible employment action is taken, an employer may raise an affirmative defense to liability consisting of two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preven-

¶ 73 Seeking to avoid vicarious liability in this case, PeopLease relies on *Hall v. Bodine Electric Co.*, 276 F.3d 345 (7th Cir.2002), for holding an individual is not a supervisor for purposes of Title VII unless the employer has entrusted that individual with authority to directly affect the terms and conditions of a victim's employment, *i.e.*, hiring, firing, demotion, transfer or discipline. To support its argument Thames was not Plaintiff's supervisor, PeopLease attaches: (1) excerpts from Findley's deposition during which he testified he was Plaintiff's supervisor during her employment at EFI, and as EFI's general manager, he had the authority to hire and terminate her, (2) Plaintiff's amended petition and U.S. Equal Employment Opportunity Commission (EEOC) Intake Questionnaire in which she identified Thames as her "co-worker" and as "another employee," respectively, and (3) Plaintiff's deposition testimony admitting she considered Mark Findley to be her supervisor and she considered Thames to be a supervisor because he trained her and gave her work assignments two to three times per week.

¶ 74 Plaintiff argues the "narrow Seventh Circuit test" followed in *Hall* is "not the general rule" and "has been rejected by the Supreme Court and the EEOC" [19] and "other circuits ... in light of the EEOC's guidance." [20] She asks this Court to adopt these authorities' interpretation of *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), as having expanded the term "supervisor" to include employees with responsibility for daily assignments, training, and controlling day-to-day activities.

¶ 75 We agree with this interpretation of *Faragher*, in which the U.S. Supreme Court reversed the Eleventh Circuit and reinstated the district court's judgment holding City vicariously liable for the hostile work environment created by two males, whom the female lifeguard included as defendants in her sexual discrimination action. From the facts developed at trial, one of the defendants in *Faragher* had authority to hire new lifeguards, to give them oral reprimands, and to supervise all aspects of their work assignments, however, the other defendant was responsible only for making their daily assignments and for supervising work and fitness training. Even though the latter individual clearly had no authority to hire, fire, demote, or discipline the other lifeguards, the U.S. Supreme Court held reversal was necessary because it was undisputed "these supervisors 'directly controlled and supervised all aspects of the plaintiff's day-to-day activities' " and "were granted virtually unchecked authority" over their subordinates. *Faragher*, 524 U.S. at 808, 118 S.Ct. at 2293.

¶ 76 Since *Faragher*, the EEOC's guidelines suggest vicarious employer liability when (1) an individual who directs another employee's day-to-day activities but lacks authority to make tangible employment decisions,[21] (2) the harasser does not have actual

tive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington*, 118 S.Ct. at 2270.

**19.** Appendix A to 29 C.F.R. § 1604.11, explains the EEOC "rescinded § 1604.11(c) of the Guidelines on Sexual Harassment, which set forth the standard of employer liability for harassment by supervisors. That section is no longer valid, in light of the Supreme Court decisions in [*Burlington*] and [*Faragher*]. The Commission has issued a policy document that examines [both decisions] and provides detailed guidance on the issue of vicarious liability by supervisors. EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors (6/18/99), EEOC Compliance Manual."

**20.** *Mack v. Otis Elevator Co.*, 326 F.3d 116, 126–127 (2nd Cir.2003) (relied on EEOC's expanded definition as to whether one qualifies as a super-

visor), *Lumhoo v. The Home Depot USA*, 229 F.Supp.2d 121, 156 (E.D.N.Y.2002) (relied on *Faragher* for its expanded definition of supervisor), *Dinkins v. Charoen Pokphand USA, Inc.*, 133 F.Supp.2d 1254, 1266 (M.D.Ala.2001) (relied on EEOC guideline and general agency principles).

**21.** Section III(A)(2) of the "EEOC Policy Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors," dated June 18, 1999, provides, in relevant part:

An individual who is authorized to direct another employee's day-to-day work activities qualifies as his or her supervisor *even if* that individual does not have the authority to undertake or recommend tangible job decisions. Such an individual's ability to commit harassment is enhanced by his or her authority *to increase the employee's workload or assign undesirable tasks*, and hence it is appropriate to

authority but the victim reasonably believes that he or she does.[22]

¶ 77 Similarly, in the case at bar, the evidentiary material PeopLease submitted to the trial court establishes Thames trained Plaintiff and gave her work assignments two to three times per week. Plaintiff further supports her testimony "she considered Thames to be a supervisor," by attaching excerpts of her deposition during which she also testified (1) when she asked Mark Findley how to do something he always told her to ask Thames, and (2) Thames gave her all of the PeopLease forms to complete on the first day at work at EFI. She also attached a copy of one of those forms, PeopLease's "Terms of Employment," which two-page document sets out, *inter alia,* Plaintiff's "full-time" employment status with a 90–day probation period, weekly salary, and her work hours and days. At the bottom of the second page, there is a box labeled "EMPLOYEE & CLIENT COMPANY REPRESENTATIVE RESPONSIBILITY: ACKNOWLEDGEMENT," which Plaintiff signed as "Employee" and Thames signed as the *"Client Company Representative."* (Emphasis added.)

¶ 78 Plaintiff also received PeopLease's "Welcome Letter" which is addressed to "PeopLease Corporation Leased Employees." This letter, which first informs employees about the "employee leasing agreement" between PeopLease and the "client company", and that "the client company, as your assigned supervisor, will direct your daily work." It further states, in relevant part, PeopLease "shall be your employer ... shall be responsible for paying your wages and the payroll taxes ... will be responsible

for complying with the various laws affecting your employment ... [and] will work with a site supervisor to administer all human resources functions, including hiring, terminations, and disciplinary procedures." Viewing the above-described evidentiary material in the light most favorable to Plaintiff, we conclude reasonable people could infer Thames was a supervisor for EFI or that it was at least reasonable for Plaintiff, as a new employee who was still under probation, to consider Thames to have supervisor authority. As a result, summary adjudication on the issue of vicarious liability was error.

### *Title VII Negligence*

¶ 79 With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action. 29 C.F.R. § 1604.11(d). When the harassing conduct is by a co-worker or fellow employee, an employer may be liable on a claim for sexual harassment if it failed to remedy or prevent a hostile work environment of which management-level employees knew, or in the exercise of reasonable care, should have known. *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 673 (10th Cir.1998).

¶ 80 PeopLease argues it had no notice of Plaintiff's sexual harassment complaints until after her termination because she failed to comply with their rules. According to the anti-harassment policy[23] in PeopLease's

consider such a person a 'supervisor' when determining whether the employer is vicariously liable.

**22.** Section III(B) of the "EEOC Policy Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors," dated June 18, 1999, provide, in relevant part:

In some circumstances, an employer may be subject to vicarious liability for harassment by a supervisor who does not have actual authority over the employee. Such a result is appropriate if the employee reasonably believed that the harasser had such power. The employee might have such a belief because, for example, the chains of command are unclear. Alterna-

tively, the employee might reasonably believe that a harasser with broad delegated powers has the ability to significantly influence employment decisions affecting him or her even if the harasser is outside the chain of command.

**23.** In relevant part, the Handbook's anti-harassment policy explained (1) employees who believe they have been treated in an improper and offensive manner should let the offending party know immediately to stop it, and (2) if the behavior continues, they should report it immediately to their supervisor and PeopLease's Human Resources Manager (H.R.M.). The policy further provided, in bold, uppercase type, a toll free telephone number for the H.R.M. and an address for written complaints.

Standard Employee Handbook, Plaintiff was required to immediately notify Findley and PeopLease's Human Resource Manager. Plaintiff argues she substantially complied by reporting to Findley, who she claims had a contractual duty to report all discrimination complaints to PeopLease.

¶ 81 Actual knowledge will be demonstrable in most cases where the plaintiff has reported harassment to management-level employees. *Id.* Findley admits Plaintiff made one complaint of sexual harassment to him, and although he contends he addressed the problem, Plaintiff testified during her deposition after the dismissals, that the harassment continued and that she made *a total of four or five* complaints. According to ¶ 3.2, entitled "Discrimination," the EFI–PeopLease Service Agreement provides, in relevant part:

> [EFI] and its officers, directors, employees and agents shall not take or fail to take any action that, if [PeopLease's] Assigned Employees were [EFI's] sole employees, might cause or result in the filing of a claim under Title VII ... or any similar law, rule or regulation governing employment relationships as amended, enacted now or later by any federal, state or local government entity. [EFI] shall immediately notify [PeopLease] of any such complaint of discrimination, whether or not filed as a claim under any applicable law with any appropriate court or agency, and Customer shall fully cooperate with [PeopLease] in [its] investigation of any such complaint by an Assigned Employee. Failure to report any such complaint or to fully cooperate in the investigation of such complaint shall be deemed a material breach of this Service Agreement by Customer. (Emphasis added.)

¶ 82 We conclude, in the light most favorable to Plaintiff, there are disputed material facts regarding whether PeopLease knew or should have known about Plaintiff's harassment complaint and whether appropriate corrective measures were taken to prevent harassment or further harassment at EFI. We conclude the trial court erred in granting summary judgment in favor of PeopLease on the issue of Title VII negligence.

¶ 83 Because PeopLease's summary judgment argument concerning Plaintiff's retaliatory discharge claim is premised on its position it had no notice of her discrimination complaints, the existence of disputed material facts on this issue and ultimate control over Plaintiff's termination, precludes summary judgment on her retaliatory discharge claim.

### CONCLUSION

¶ 84 The trial court's dismissal of Plaintiff's Title VII claims against Findley in his individual capacity is AFFIRMED. We REVERSE the trial court's dismissal of Plaintiff's interference with economic relations theory of recovery and AFFIRM as to dismissal of the malicious wrong theory. The trial court's summary judgment order in favor of PeopLease on Plaintiff's Title VII claims is REVERSED and the case is remanded for further proceedings.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

BUETTNER, P.J., concurs in part and dissents in part, and HANSEN, J., concurs.